# Exhibit "A"

```
              UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA        )     18-193-1, -2, -3
                                )
     vs.                        )
                                )
                                )
DKYLE JAMAL BRIDGES             )
KRISTIAN JONES                  )
ANTHONY JONES                   )     Philadelphia, PA
                                )     February 15, 2019
              Defendants        )     11:07


                      MOTION TO SUPPRESS
         BEFORE THE HONORABLE NITZA I. QUIÑONES ALEJANDRO
                  UNITED STATES DISTRICT JUDGE

APPEARANCES:


For the Government:             JESSICA M. URBAN, ESQUIRE
                                U.S. DEPARTMENT OF JUSTICE
                                1400 New York Avenue NW
                                Washington, DC  20005
                                jessica.urban@usdoj.gov

For the Defendant,              ANDREW MONTROY, ESQUIRE
Dkyle Jamal Bridges             1500 Walnut Street, 22nd Floor
                                Philadelphia, PA  19102
                                amontroy@gmail.com

For the Defendant,              LEIGH MICHAEL SKIPPER, ESQUIRE
Kristian Jones                  ANNA KESSLER, ESQUIRE
                                FEDERAL COMMUNITY DEFENDER OFFICE
                                601 Walnut Street, Suite 540 West
                                Philadelphia, PA  19106
                                leigh_skipper@fd.org
                                anna_kessler@fd.org


              SHANNAN GAGLIARDI, RDR, CRR
                 OFFICIAL COURT REPORTER
         U.S. DISTRICT COURT, EASTERN DISTRICT OF PA
                601 Market Street, Room 2609
                   Philadelphia, PA  19106
                       (267)299-7254
```

1   Township.
2       Q.   Using just the initials of the minors, who were
3   those?
4       A.   NG and LC.
5       Q.   When did you learn about the recovery of those two
6   minors at the Motel 6, approximately?
7       A.   Maybe a day or two afterwards.
8       Q.   What, generally speaking, did you learn at that time?
9       A.   That there were two minors that were recovered, and
10  that it was a suspicion of sex trafficking within the two after
11  they were brought back to the police station and interviewed as
12  well.
13      Q.   Were there any suspects at that initial stage of the
14  investigation?
15      A.   Yes.
16      Q.   Who?
17      A.   Kristian Jones, Mr. Kristian Jones.
18      Q.   What was the basis for Kristian Jones being a suspect
19  at that initial stage?
20      A.   He was found in the room with the two minors.
21      Q.   Was there additional evidence in addition to his mere
22  presence at that particular time?
23      A.   Additional evidence, I think besides -- well, with
24  the two minors and their statements, I believe so.
25      Q.   How did Dkyle Bridges become a suspect in this

1 particular case?
2     A. Through the minors mentioning that a friend of
3 Mr. Kristian Jones drove them up, I believe, in a black car,
4 and one referred to him as D. The other one referred to him as
5 K. And then also through -- from there, from multiple
6 interviews of different witnesses and other victims as well.
7     Q. What were some of those other victim and witness
8 interviews that led you to Dkyle Bridges as a suspect?
9     A. Interviews of victims, victims' mothers, hotel
10 managers and staff, as well as surveillance.
11     Q. I want to direct your attention still to November of
12 2016, around November 23.
13     Did you obtain any information about any other
14 potential sex trafficking involving Dkyle Bridges and any of
15 the victims in this case?
16     A. Yes. FBI Baltimore informed FBI Philadelphia that
17 Mr. Bridges' name was mentioned in an interview of a minor that
18 was recovered in a prostitution sting in Newark, Delaware.
19     Q. Who was that minor by initials?
20     A. BT.
21     Q. When, approximately, did FBI obtain this information
22 about the incident between BT where Dkyle Bridges' name was
23 mentioned?
24     A. I believe it was maybe 30 days after the initial
25 recovery of the two minors.

1  Taurus.  The plates were ran.  The plates came back to a
2  Camille Bridges at 728 Plumtree Lane.  I saw that same Ford
3  Taurus again at a Motel 6 in Delaware.  Ran the plates again,
4  and it came back to the same registration as far as that house
5  as well.
6      Q.  Turning your attention to May of 2017, did you
7  receive any information about Dkyle Bridges around that time?
8      A.  Yes.  Sergeant James Simpkins from Tinicum Township
9  contacted me to state that there was an altercation at the
10 Quality Inn within his jurisdiction between Mr. Bridges and
11 another female.
12     Q.  Did you learn who that female was?
13     A.  Yes.
14     Q.  What was her name?
15     A.  Jordan Lopez-Ervin.
16     Q.  Did you know anything about the circumstances under
17 which Jordan Lopez-Ervin -- let me rephrase.
18         Did you learn anything about the employment history
19 of Jordan Lopez-Ervin?
20     A.  At that time, yes, we knew she had a warrant out for
21 prostitution charged in Philadelphia.  And prior to that, I
22 believe I spoke with her mother as well.
23     Q.  What did you learn from speaking with her mother?
24     A.  That she was working for Mr. Bridges as a prostitute.
25     Q.  Turning your attention to on or around June 20 of

1  2017, did FBI obtain additional information about the
2  relationship between Bridges and BT or other potential victims
3  of trafficking?
4      A.   Yes.
5      Q.   What was that information?
6      A.   That information came from an interview of BT's
7  mother, and it was basically stating that BT started working
8  for Mr. Bridges as a prostitute around 16 years old, that he
9  was violent towards her, that he had dragged her outside of a
10 moving car by her hair, that he would force her to engage --
11 force her to have -- perform oral sex on him, that she had
12 taken him -- or he had taken her to Baltimore to perform dates
13 as a prostitute across state lines as well.
14     Q.   I'm going to get into a little bit more of the
15 content, but just to back up into the logistics, did FBI
16 actually meet with BT's mother in June of 2017?
17     A.   Yes.
18     Q.   Who from FBI met with BT's mother?
19     A.   Myself and a task force officer within the
20 Philadelphia Police Department.
21     Q.   Who was that?
22     A.   That was Officer Arthur Weston.
23     Q.   Had law enforcement previously been in contact with
24 BT's mother before this June 20, 2017 discussion?
25     A.   I believe Officer Weston was.

1  versus making contact on the 11th?

2      A.   I believe some of the similarities from this ad were
3  posted on the 11th, and so when this ad was posted, it had the
4  same similarities, whether that would have been the photos or
5  the phone number or the Miss Maya that's written on the back of
6  the picture.

7      Q.   Tell me if I'm summarizing your testimony clearly.
8           There were multiple ads for BT during this time
9  period?

10     A.   Yes.

11     Q.   What law enforcement agencies were involved in the
12  sting on July 12, 2017?

13     A.   The Federal Bureau of Investigation and the
14  Philadelphia Police Department.

15     Q.   Was law enforcement expecting to see Mr. Bridges
16  during that operation?

17     A.   We knew it was a chance that he would be there.

18     Q.   What information did law enforcement have at that
19  time as to what Mr. Bridges looked like?

20     A.   We had his -- the previous mug shot from the JNet
21  photo as well, and we knew what type of car that he's been
22  known to drive.

23     Q.   What information, if any, did law enforcement have
24  about what kind of vehicle Mr. Bridges might be associated with
25  at that time?

1  related to this operation?
2      A.   I believe everyone met at a staging area that was not
3  far from the Motel 6.  It was right around the corner from it.
4      Q.   Were other law enforcement officers in the parking
5  lot of the Motel 6?
6      A.   Yes, there were other officers in the parking lot,
7  yes.
8      Q.   And to be clear, what road or area of Philadelphia
9  was this Motel 6 in?
10     A.   This was right off of Roosevelt Boulevard in the
11 Northeast.
12     Q.   Did you end up leaving the staging area at any point?
13     A.   Yes.
14     Q.   Why?
15     A.   Once Officer Weston made contact with the woman that
16 he was presumed to be communicating with through the ad, he
17 gave a signal for his team to converge in.  So we all left the
18 staging area and reported to the Motel 6.
19     Q.   Where at the Motel 6 did law enforcement converge?
20     A.   We converged on the entrance closest to where the
21 room where Officer Weston would have entered.
22     Q.   Was that a parking lot?
23     A.   Yes.
24     Q.   Did you see any other vehicles other than the law
25 enforcement response?

1    identification as far as whatever they could have, license or
2    whatnot.
3        Q.   Did Mr. Bridges have any such identification with
4    him, if you recall?
5        A.   I don't recall if he had it, but it was later found
6    out what he did have was suspended, his license.
7        Q.   What happened as a result of determining that his
8    license was suspended?
9        A.   His car was impounded.
10       Q.   To your knowledge, is impoundment a standard practice
11   when an individual is found in the driver's seat of a vehicle
12   with a suspended license?
13       A.   I believe it's a practice for the Philadelphia Police
14   Department.
15            MR. MONTROY:  Objection.
16            THE COURT:  Sustained.
17   BY MS. URBAN:
18       Q.   Do you know whether an inventory search was
19   conducted?
20       A.   Yes.
21       Q.   And was it, in fact, conducted?
22       A.   Yes.
23       Q.   Who conducted that inventory search?
24       A.   Officers of the Philadelphia Police Department, which
25   is the standard practice for them.

1  A.   Yes.

2  Q.   Guns drawn?

3  A.   At that point, yes.

4  Q.   And you approach, as well as these other officers,
5  and order Mr. Bridges out of the car, correct?

6  A.   Yes.  The Philadelphia officers ordered him out the
7  car, yes.

8  Q.   With guns drawn, correct?

9  A.   Yes.

10 Q.   And he complied, correct?

11 A.   Yes.

12 Q.   And it's fair to say the car had not moved at any
13 point when you came to the scene, correct?

14 A.   When I came to the scene, the car had not moved.  It
15 was already parked, from what I can recall from my vantage
16 point.

17 Q.   Right.  Because you also testified that you were
18 asked on direct if the vehicle was on or off, correct?

19 A.   Correct.

20 Q.   Your best recollection is it was on, correct?

21 A.   Yes.

22 Q.   But did you retrieve the keys from that car?

23 A.   No.

24 Q.   You indicated that you had -- it was your belief that
25 Mr. Bridges might be there that day; is that correct?

1    A.    I knew it was a chance that he would be, yes.

2    Q.    Gotcha.  You had no specific information that he was
3 going to be there that day, correct?

4    A.    No.

5    Q.    No informant told you he'll be there that day,
6 correct?

7    A.    No.

8    Q.    That was just your -- strike that.

9          I think you indicated that after Mr. Bridges is
10 ordered out of the vehicle Philadelphia police start
11 questioning him; is that correct?

12   A.    Yes.

13   Q.    Did you question him at all?

14   A.    Philadelphia police were the lead investigators on
15 that one.  So they questioned him, and we just talked
16 generally, in generality, yes.

17   Q.    Okay.  When you say "in generality," you had
18 conversation with Mr. Bridges, correct?

19   A.    Yes.

20   Q.    Fair to say you didn't take a statement from him,
21 right?

22   A.    No.  I took a statement as we -- as it continued on,
23 before he was released, I just asked him, in general, what are
24 you doing here, whatnot, and he gave a statement that I wrote
25 up.

1      A.    On March 27, yes.

2      Q.    Okay.  Did you know what he looked like on
3 January 17?

4      A.    I would have to refer to my notes when it was
5 actually given to me from the FBI in Baltimore.

6      Q.    Well, the date of entry on that report from
7 January 17 of 2017 says date of entry.

8            Could you just point out what that is?  What was the
9 date of that, Agent?

10     A.    Date of entry was May 19.

11     Q.    Okay.  And so you entered that on May 19, 2017,
12 right?

13     A.    The investigation was on January 17, I started this
14 on March 15, and then it was serialized on May 19.

15     Q.    It's fair to say that nowhere in your report, as of
16 May 19 when it was -- what was the word you used?

17     A.    Serialized.

18     Q.    -- does it indicate that you saw Dkyle Bridges coming
19 in and out of that car on that date, correct?

20           MS. URBAN:  Objection, Your Honor.

21           THE COURT:  Overruled.

22           THE WITNESS:  Can you repeat it?

23 BY MR. MONTROY:

24     Q.    Sure.  It's fair to say that nowhere in your
25 report --

1   A.   On the January 17?

2   Q.   Yep -- that was entered on May 19 does it indicate
3   that Dkyle Bridges is the person you identified getting in and
4   out of that vehicle that morning, correct?

5   A.   No.  It says it right here.  It says unknown black
6   male.

7   Q.   Okay.  Dkyle Bridges is not arrested on July 12,
8   2017, correct?

9   A.   No.

10  Q.   He's not arrested on November 15, 2016, right?

11  A.   No.

12  Q.   Not arrested on November 23, 2016, right?

13  A.   No.

14  Q.   Okay.  And --

15       THE COURT:  No meaning correct, he was not arrested?

16       THE WITNESS:  Yes, ma'am.  He was not arrested.

17  BY MR. MONTROY:

18  Q.   To the best of your knowledge, he's not arrested
19  between November 15, 2016 and July 12, 2017, correct?

20       MS. URBAN:  Objection, Your Honor, relevance.

21       THE COURT:  Overruled.

22  BY MR. MONTROY:

23  Q.   To the best of your knowledge.

24  A.   Can you repeat it?  I'm sorry.

25  Q.   Sure.  I said to the best of your knowledge,

1    A.    Correct.
2    Q.    Is it fair to say that all of those items that are on
3 a property receipt are the full contents of the items that were
4 recovered from that vehicle and seized for evidence?
5    A.    Yes, I'll say it's fair to say.
6    Q.    Okay.  And you see several cell phones on there,
7 correct?
8    A.    Yes.
9    Q.    Okay.  Have you gone through all of those cell
10 phones?
11          MS. URBAN:  Objection, Your Honor, relevance.
12          THE COURT:  Overruled.
13          THE WITNESS:  Between myself and Agent Grill, we
14 probably would have went through all of them.
15 BY MR. MONTROY:
16    Q.    You're not sure specifically which ones you've gone
17 through?
18    A.    Not without looking at them, no.
19    Q.    Okay.  Is it fair to say that that property receipt
20 does not reflect where those items were recovered in that
21 vehicle; is that correct?
22    A.    As far as the exact location?
23    Q.    Yes.
24    A.    The one Alcatel was found in center console.  The
25 other black Alcatel was found in glove box.

1    A.   No.

2    Q.   No recording at all?

3         MS. URBAN:  Objection, Your Honor, asked and
4  answered.

5         THE COURT:  Overruled.

6  BY MR. MONTROY:

7    Q.   No?

8    A.   No.

9         THE COURT:  Did you write a report?

10        THE WITNESS:  Yes, ma'am.

11        THE COURT:  About this July 13 meeting?

12        THE WITNESS:  Yes, ma'am.

13        THE COURT:  Okay.

14        MR. MONTROY:  I'll mark it as DB-6.

15  BY MR. MONTROY:

16   Q.   Agent, when you get a chance to look at that
17  document, let me know when you're finished.

18   A.   Yes.

19   Q.   Is that the document, DB-6, that you prepared known
20  as a 302 document?

21   A.   Correct.

22   Q.   It's fair to say that this was done on July 12, 2017;
23  is that correct?

24   A.   No.  The date on here is wrong.  It was the morning
25  of July 13.