IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | NO. 18-193-1 |
| | : | |
| DKYLE JAMAL BRIDGES | : | |
| *Defendant* | : | |

# ORDER

**AND NOW**, this 19th day of March 2019, upon consideration of Defendant Dkyle Jamal Bridges' ("Defendant") *motion to suppress physical evidence*, (Doc. 55), the Government's response in opposition, (Doc. 81), the evidence and oral argument heard at the motion to suppress hearing held on February 15, 2019, Defendant's post-hearing brief, (Doc. 164), the Government's post-hearing brief, (Doc. 167), and the Government's post-hearing response brief, (Doc. 170), and, it is hereby **ORDERED** that Defendant's motion to suppress is **DENIED**.[1]

---

[1] In the underlying motion, Defendant requests the suppression of all physical evidence seized on July 12, 2017, from a Ford Taurus, including several cellphones, a laptop computer, and the information contained thereon, on the grounds, *inter alia*, that the initial seizure of the Ford Taurus was not supported by reasonable suspicion and that the warrant issued thereafter was overly general and lacked probable cause.

At the evidentiary hearing, the Government presented Federal Bureau of Investigation Special Agent Christopher Jackson ("Agent Jackson"), a three-year agent of the force who worked in a unit dealing with violent crimes against children, including human trafficking, child exploitation, and labor trafficking. Agent Jackson described Backpage as a website that is utilized to sell legitimate goods and services, as well as illegal escort services involving sex trafficked victims. According to Agent Jackson, in November 2016, two minors were recovered from a sex trafficking operation in Tinicum Township, Pennsylvania. A man named Kristian Jones (a co-defendant in this case) was found in the room with the two minors. The minors relayed to the law enforcement authorities that a friend of Jones, named "D," had driven them "up" in a black car. Interviews with the victims, the victims' mothers, the hotel managers and staff, and other surveillance led to the conclusion that "D" was Defendant Dkyle Jamal Bridges. Additionally, Defendant's name was found in text messages in cellphones seized in the Tinicum arrest.

On November 23, 2016, FBI Baltimore informed FBI Philadelphia that Defendant's name was mentioned in an interview of a minor (B.T.) recovered during a prostitution sting in Delaware. Agent Jackson came to know what Defendant looked like from seeing his mug shot. Agent Jackson performed surveillance in Delaware, during which he, at least twice, saw a black Ford Taurus with license plates registered to Camille Bridges (Defendant's mother). Although Agent Jackson saw a black male exit the car in daylight hours, from his vantage point, he could not positively identify the male as Defendant.

In May 2017, Tinicum Township Police Department Sergeant James Simpkins contacted Agent Jackson to inform him of an altercation in a hotel in Tinicum between Defendant and a female named Jordan

Lopez-Ervin. As part of that investigation, Agent Jackson was made aware of an outstanding warrant for Lopez-Ervin's arrest, and that according to her mother, Lopez-Ervin was working for Defendant as a prostitute. In June 2017, in an interview with Agent Jackson, B.T.'s mother stated that: B.T. started working for Defendant as a prostitute around the age of 16, he was violent towards her, he would force her to perform oral sex on him, he had taken her across state lines to Baltimore to perform dates as a prostitute, and that "he would also threaten with firearms as well and that he was known to carry them." Agent Jackson showed B.T.'s mother a Backpage ad, and she confirmed that it was B.T. in the ad. Agent Jackson further testified that the FBI waited for another Backpage ad with the same picture "to pop up wherever it might be advertised on the Backpage website," and it eventually did, leading to a sting operation, at a Motel 6 in Northeastern Philadelphia in July 2017.

As part of that sting operation, an undercover Philadelphia Police Department ("PPD") officer made contact via the Backpage ad on July 11, 2017, for a date with B.T. the following day. Agent Jackson advised the law enforcement officers involved with the sting that Defendant drove a black Ford Taurus with Delaware license plates. During the sting operation, the FBI served as backup for the PPD. Once the undercover PPD officer made contact with B.T. inside the Motel 6, he signaled to the law enforcement officers who were stationed nearby. Law enforcement converged into the Motel 6 parking lot closest to the room that the undercover officer had entered. Upon entering the parking lot, they observed a black Ford Taurus with Delaware license plates parked near the room the undercover officer had entered. Defendant sat in the driver's seat and Lopez-Ervin was in the passenger front seat. Officers, including Agent Jackson, converged on the Ford Taurus and ordered Defendant and Lopez-Ervin to keep their hands up and to exit the vehicle. A pat-down for officer safety was conducted (Agent Jackson testified that in his experience, pimps often carried firearms), and the two individuals were questioned. A visual inspection noted two boxes of magnum condoms inside the vehicle. It was later determined that Defendant's driver's license was suspended. The Ford Taurus was impounded as a result and an inventory search was conducted. Agent Jackson interviewed B.T. the following morning, and she told him that she had worked for Defendant as a prostitute; he was violent; he assaulted her; he assaulted another female; he would give her whatever money he deemed necessary, if any, for performing dates; and she did not feel free to leave. On July 13, 2017, the FBI applied for a warrant to search the Ford and the contents inside, including the digital information on the cellphones. Agent Jackson believed that cellphone evidence was relevant to the investigation of sex trafficking because cellphones are always used for trafficking to communicate with the victims and the johns, and are often used to place Backpage ads. He also opined that the search history of the cellphones was relevant for ascertaining Backpage information. Agent Jackson testified that he generally requested everything on a cellphone because there are different ways in which people hide files and information on cellphones, including with apps that disguise files. The warrant was executed on July 14, 2017.

In his motion to suppress, Defendant argues that: the investigatory seizure of the Ford Taurus was not supported by reasonable suspicion nor evidence of a traffic violation, the search warrant was not supported by probable cause to believe evidence of sex trafficking would be found in the Ford Taurus, the search of the cellphones was based on an unconstitutionally general search warrant, and the towing and impounding of the vehicle was in contravention of local procedure. The Government disagrees and argues that there was more than reasonable suspicion to justify the investigatory seizure of the vehicle, there was in fact probable cause; the warrant was supported by probable cause; the warrant was not unconstitutionally general given that the search was for evidence related to trafficking; and the local procedures pertaining to towing cars is a red herring because there was probable cause to search the Ford Taurus, and that violations of local procedure are not grounds for suppression of evidence in a federal criminal case.

As to the seizure of the Ford Taurus, it is well-settled that such a seizure constitutes a permissible *Terry* stop when "supported by reasonable, articulable suspicion that criminal activity was afoot." *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) (describing "reasonable suspicion" standard); *see also*

2

*United States v. Hester*, 910 F.3d 78, 87 (3d Cir. 2018) (treating the act of police cars boxing in parked car as a *Terry* stop). Based upon the credible evidence offered, this Court finds that the seizure of the Ford Taurus was proper, as Agent Jackson's lengthy and thorough investigation amply demonstrated that there was "reasonable, articulable suspicion that criminal activity was afoot," and that Defendant was involved. Notably, Agent Jackson's investigation had led him to believe that Defendant was B.T.'s pimp and that Defendant was responsible for scheduling the date with B.T. that had been set up as part of the sting operation. Defendant was detained inside the Ford Taurus parked just outside of the motel room. Based on his investigation and experience, Agent Jackson had more than reasonable suspicion; he had probable cause to conclude that Defendant was committing a sex trafficking offense. *See United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002) ("Probable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested.") (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

To the extent Defendant argues that evidence of a traffic violation was required to be able to seize the Ford Taurus, he is mistaken. Although "the Supreme Court established a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely a pretext for an investigation of some other crime," *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) (citing *Whren v. United States*, 517 U.S. 806 (1996)), where, as here, an officer has "reasonable, articulable suspicion that criminal activity is afoot," *Ramos*, 443 F.3d at 308, a traffic violation or other pretext is not needed to stop the car in question. Accordingly, because law enforcement had *at least* reasonable suspicion to justify the seizure of the Ford Taurus, the existence or non-existence of a traffic violation is irrelevant.

With regard to Defendant's argument that there was not probable cause to support the search warrant, as set forth above, this Court finds there was probable cause at the time of the initial seizure of the vehicle, which in and of itself would supply the requisite probable cause for the warrant. Further, at the time Agent Jackson applied for the search warrant, he had additional supporting facts he learned from his subsequent interview with B.T. on July 13, 2017, in which she advised him that she worked for Defendant as a prostitute, Defendant assaulted her, and she did not feel free to leave Defendant's employ. *See Myers*, 308 F.3d at 255 (probable cause standard).

This Court also notes that with regard to the recovery of the actual physical devices inside the vehicle, a warrant was not necessary in this case, pursuant to the automobile exception to the Fourth Amendment. *See United States v. Donahue*, 764 F.293, 299-300 (3d Cir. 2014) (noting generally that "[t]he automobile exception permits vehicle searches without a warrant if there is probable cause to believe that the vehicle contains evidence of a crime."). Further, "the government can search an impounded vehicle without a warrant even though it has secured the vehicle against the loss of evidence and it has the opportunity to obtain a warrant for the search." *Id.* (quoting *United States v. Salmon*, 944 F.2d 1106, 1123 (3d Cir. 1991)).

With regard to Defendant's argument that the warrant was unconstitutionally general as to the search of the cellphones and laptop for data, this Court finds that the scope of the warrant was permissible, given that the search was for files associated with sex trafficking which, as Agent Jackson explained, could come in many forms, including under disguised names or applications. *See, e.g., United States v. Gorny*, 2014 WL 2860637 (W.D. Pa. June 23, 2014) (rejecting argument that warrant for search of cellphone was unconstitutionally general where phone was used in the drug trade); *see also United States v. Stabile*, 633 F.3d 219, 236-46 (3d Cir. 2011) (discussing warrants for, and searches of, electronic devices).

Finally, Defendant contends that when the law enforcement authorities do not comply with state or local procedures in towing vehicles, an inventory search is impermissible under state or local procedures

BY THE COURT:

/s/ *Nitza I. Quiñones Alejandro*
**NITZA I. QUIÑONES ALEJANDRO**
*Judge, United States District Court*

---

and should be suppressed. Defendant is mistaken; such violations do not result in suppression in a federal case. *See United States v. Bedford*, 519 F.2d 650, 655 n.11 (3d. Cir. 1975) ("[E]ven though evidence may have been obtained unlawfully under state standards, it may be admissible in a federal prosecution if all federal standards are met."). Accordingly, for the reasons discussed, Defendant's motion is denied.

BY THE COURT:

/s/ *Nitza I. Quiñones Alejandro*
**NITZA I. QUIÑONES ALEJANDRO**
*Judge, United States District Court*

---

and should be suppressed. Defendant is mistaken; such violations do not result in suppression in a federal case. *See United States v. Bedford*, 519 F.2d 650, 655 n.11 (3d. Cir. 1975) ("[E]ven though evidence may have been obtained unlawfully under state standards, it may be admissible in a federal prosecution if all federal standards are met."). Accordingly, for the reasons discussed, Defendant's motion is denied.